# In the United States Court of Federal Claims

No. 10-540 C

(E-Filed: December 13, 2013)

|  |  |  |
|---|---|---|
| CANVS CORPORATION, | ) | Patents; Summary Judgment; Anticipation Pursuant to 35 U.S.C. § 102(e) (2006); Obviousness Pursuant to 35 U.S.C. § 103; Expert Testimony |
| Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Joseph J. Zito, Washington, DC, for plaintiff.

John A. Hudalla, Attorney, with whom were Stuart F. Delery, Assistant Attorney General, and John Fargo, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Lindsay K. Eastman, Attorney, United States Department of Justice, of counsel.

## OPINION

CAMPBELL-SMITH, Chief Judge

        Plaintiff CANVS Corporation (CANVS) holds U.S. Patent No. 6,911,652 (filed June 28, 2005) (the '652 patent), which is directed toward a low-light imaging device for use in military applications.  See Compl. for Patent Infringement (Complaint or Compl.), Docket Number (Dkt. No.) 1, ¶ 3[1]; see also Def.'s Mot. for Summ. J. of Invalidity of All Claims of the Patent-in-Suit (defendant's Motion or Def.'s Mot.), Dkt. No. 59, Ex. A ('652 patent).  Plaintiff brought this action pursuant to 28 U.S.C. § 1498(a) (2006) to recover compensation for the government's alleged unlawful use or manufacture of the invention covered by the '652 patent.  Compl. 1; cf. 28 U.S.C. § 1498(a) (providing a cause of action for patent infringement by the government).

---

        [1]The Complaint for Patent Infringement (Complaint or Compl.), Docket Number (Dkt. No.) 1, filed by plaintiff CANVS Corporation (plaintiff or CANVS) is organized into numbered paragraphs with the exception of an introductory section.  See Compl. passim.  The court provides paragraph numbers when citing the numbered paragraphs and page numbers when citing the introductory section of the Complaint.

Defendant has moved for summary judgment on its affirmative defense of invalidity, contending that each claim of the '652 patent is anticipated by U.S. Patent No. 5,035,472 (filed July 30, 1991) (the Hansen patent or the Hansen device), pursuant to 35 U.S.C. § 102(e) (2006).[2]  Def.'s Mot. 1; see also id. Ex. B (Hansen patent).  In the alternative, defendant contends that claims two and three of the '652 patent are rendered invalid as obvious by the combination of the Hansen patent and a second prior art reference.  Id. at 23–24.  Defendant asserts that "the testimony of plaintiff's expert [witness], Mr. [James Brian] Gillespie, should be ignored by the court because it has been proven unreliable."  Def.'s Reply in Supp. of its Mot. for Summ. J. of Invalidity of all Claims of the Patent-in-Suit (defendant's Reply or Def.'s Reply), Dkt. No. 69, at 23 (emphasis and some capitalization omitted).

The central issue to be resolved on summary judgment is whether the earlier-issued Hansen patent anticipates the independent brightness adjustment feature of the '652 patent.  See infra Part III.A.2 (discussing the parties' arguments with respect to this issue).  Both the Hansen patent and the '652 patent contain two types of imaging assemblies:  (1) an image intensifier, which amplifies dim light and near-infrared energy; and (2) a thermal imager, which detects the far-infrared thermal signature of warm objects, such as human beings.  See infra Part I.A–B (describing these assemblies).  The '652 patent also describes a mechanism for independently adjusting the output brightness, or intensity, of the two imaging assemblies, which allows a user to determine how much of the final viewed image is made up of output from the respective imaging assemblies.  See infra Part I.A.

Relying on the testimony of its expert witness, Mr. Gillespie, as to how the Hansen patent would be interpreted by a person of ordinary skill in the art as well as the testimony of its fact witness, Mr. Roland G. Dumais, Jr., as to the capabilities of the night vision systems in the Army's possession at the relevant time,[3] plaintiff contends that the

---

[2]On September 16, 2011, section 102 and section 103 of title 35 of the United States Code were amended by the Leahy-Smith America Invents Act, Pub. L. No. 112-29, sec. 3(b)–(c), §§ 102–03, 125 Stat. 284, 285–87 (2011) (to be codified, in relevant part, at 35 U.S.C. §§ 102–03).  The relevant amendments are applicable only to patents and patent applications with effective filing dates on or after March 16, 2013, see id. sec. 3(n)(1), 125 Stat. at 293, and are therefore inapplicable to this dispute, see Def.'s Mot. for Summ. J. of Invalidity of All Claims of the Patent-in-Suit (Def.'s Mot.), Dkt. No. 59, Ex. A (U.S. Patent No. 6,911,652 (filed June 28, 2005) (the '652 patent)); id. Ex. B (U.S. Patent No. 5,035,472 (filed July 30, 1991) (the Hansen patent or the Hansen device)).

[3]Plaintiff also relies on the testimony of Mr. Roland G. Dumais, Jr. to address topics that are not appropriately addressed by lay witnesses.  See, e.g., Pl. CANVS Corp.'s Opp'n to the Def.'s Mot. for Summ. J. of Invalidity (Pl.'s Resp.), Dkt. No. 66, at 10, 13 (quoting Mr. Dumais' interpretation of the Hansen patent); id. at 2 (quoting Mr. Dumais' statement that CANVS "is entitled to compensation" (internal quotation marks omitted)); cf. id. at 13 (stating that Mr. Dumais is "clearly an expert in the area of fused

Hansen patent does not anticipate the independent brightness adjustment feature.  See Pl. CANVS Corp.'s Opp'n to the Def.'s Mot. for Summ. J. of Invalidity (plaintiff's Response or Pl.'s Resp.), Dkt. No. 66, at 8–9.  Defendant contends that the Hansen patent does anticipate this feature, relying on the testimony of its expert witness, Dr. Allen M. Waxman, as to the correct interpretation of the Hansen patent.  Def.'s Mot. 14–16 (applying Dr. Waxman's interpretation of the Hansen patent); Def.'s Reply 14 (same); cf. Def.'s Mot. Ex. E (Waxman Aff. ¶¶ 9–10) (contending that the Hansen patent discloses independent brightness adjustment).

Before the court are:  defendant's Motion, filed March 12, 2013; plaintiff's Response, filed May 17, 2013; defendant's Reply, filed July 12, 2013; and Plaintiff's Sur-Reply (Pl.'s Sur-Reply), Dkt. No. 78, filed by leave of the court on September 5, 2013.  Oral argument was conducted on September 18, 2013.[4]  This matter was transferred to the undersigned on October 18, 2013.  Order of Oct. 18, 2013, Dkt. No. 79.  For the following reasons, defendant's motion is GRANTED-IN-PART and DENIED-IN-PART.

I.     Background

     A.     The '652 Patent

The '652 patent is directed toward a "low light imaging device" with two imaging assemblies:  an image intensifier and a thermal imager.[5]  Def.'s Mot. Ex. A ('652 patent)

---

night vision technology").  Because Mr. Dumais was not disclosed as an expert witness in this matter, the court disregards such testimony by Mr. Dumais.

[4]The oral argument was recorded by the court's Electronic Digital Recording system (EDR).  The times noted in the oral argument citations refer to the EDR.

[5]The thermal imagers and image intensifiers of interest in this motion have various names.  See, e.g., Def.'s Mot. Ex. A ('652 patent) [57] (referring to a "thermal imaging assembly" and an "image intensification assembly"); id. Ex. B (Hansen patent) col.3 l.57–60 (referring to a "far infrared spectrum processing means" and a "near infrared processing means").  Because the parties use many of these terms interchangeably and identify no material difference between them, the court understands the terms to be synonymous for purposes of the present motion.  See, e.g., Def.'s Mot. 12–13 (contending that, like the '652 patent, "[the] Hansen [patent] discloses a 'thermal imaging assembly'" and "'an image intensification assembly'" (emphasis omitted)); Pl.'s Resp. 10 (using the terminology of the '652 patent to identify element 28 of the Hansen patent as "the image intensifier tube" and elements 18, 24 and 26 as "the thermal imager"); Oral Argument of Mr. Joseph J. Zito at 10:14:45–58 (colloquy between the court and Mr. Zito) (agreeing—using the terminology employed in the Hansen patent—that the '652 patent allows independent adjustment of the near-infrared and far-infrared imaging assemblies); cf. id. at 10:10:52–11:56 (agreeing that an image intensification assembly

[57].  The output brightness of each imaging assembly can be adjusted independently so that each assembly provides more or less of the output image viewed by the user.[6]  See id.  According to the '652 patent's specification, the image intensifier "amplif[ies] . . . photons in order to generate an enhanced photon based image."  Id. col.4 l.44–45.  The thermal imager "is preferably of a class of imaging assemblies which are able to detect or identify thermal energy emitted or radiated by a particular object" and "preferably includes an infrared imaging device," commonly known as a "forward looking infrared device[]."  Id. col.4 l.12–21.

The independent adjustments are intended to allow the user to take advantage of the benefits of both types of imaging assemblies while minimizing the deficiencies of each.  See id. col.2 l.32–36.  For instance, image intensifiers are not useful in total darkness because they require "at least some photons to be perceived by the night vision device."  Id. col.1 l.41–43.  Contrastingly, thermal imagers can function in total darkness, id. col.2 l.15–18, because they operate by detecting the thermal signatures of warm items, id. col.2 l.5–8.  "[H]owever, in some circumstances[,] [thermal imagers] do not provide a sufficiently clear image and/or may be blocked by other objects which can mask or interfere with . . . the perception of emitted infrared radiation."  Id. col.2 l.18–22.

The '652 patent contains seven claims, the first of which provides:

    1.      A low light imaging device comprising:
    a)      an optical input structured to define a line of sight;
    b)      a thermal imaging assembly responsive to radiation signatures disposed within said line of sight;
    c)      an image intensification assembly responsive to photons at least within said line of sight;
    d)      said thermal imaging assembly structured to generate a real time thermal image representative of said radiation signatures;
    e)      said image intensification assembly structured to generate a real time enhanced photon based image;
    f)      an image adjustment assembly including a thermal image adjustment assembly and a photon image adjustment assembly;
    g)      said thermal image adjustment assembly structured to adjust an intensity of said thermal image;

---

amplifies near-infrared light and that the other relevant type of imaging assembly—a thermal imager—senses "actual infrared light . . . heat energy" or "far-infrared" energy, such as the heat emitted by a human body).

[6]The '652 patent refers to adjusting image intensity, which the court understands to be a reference to image brightness.  See, e.g., Def.'s Mot. Ex. A ('652 patent) col.6 l.48–53; cf. infra Part III.A.2.b (finding unpersuasive plaintiff's attempt to distinguish intensity from brightness).

h)      said photon image adjustment assembly structured to adjust said
        image intensification assembly so as to adjust an intensity of said
        enhanced photon based image generated thereby;

i)      said thermal image adjustment assembly and said photon image
        adjustment assembly being structured to be operable independent
        from one another; and

j)      an output image generation assembly structured to combine said
        thermal image and said enhanced photon based image to generate a
        real-time, direct view output image.

Id. col.6 l.33–60.

Claims four, five and seven describe the independent brightness adjustment
feature.  Claim four, which depends from claim one, provides:  "A low light imaging
device as recited in claim 1 wherein said thermal image adjustment assembly and said
photon image adjustment assembly are structured to be independently and separately
adjusted relative to one another."[7]  Id. col.7 l.19–23.  Claim five describes image
adjustment assemblies "operable to adjust . . . [the] imaging assemblies so as to adjust an
intensity of said thermal image and said enhanced photon based image."  Id. col.7 l.33–
38.  Claim seven, although it appears to be missing several words, also seems to describe
independent adjustment.  See id. col.8 l.29–33.

B.      The Hansen Patent

The Hansen patent lists Charles L. Hansen—an employee of the United States
Army stationed at Fort Belvoir, Virginia—as its inventor and "[t]he United States . . .
[whose interest is] represented by the Secretary of the Army," as the assignee.  See id.
Ex. B (Hansen patent) [73], [75].  The Hansen patent is directed toward a "multispectral
sight."  See id. [57].  According to its specification, the Hansen device has "processing
means for each of . . . three distinct spectrum channels," which "are preferably a visible
spectrum for daytime viewing, a near infrared spectrum for twilight viewing, and a far
infrared spectrum for thermal viewing at nighttime."  Id. col.1 l.61–66.  The Hansen
device uses fully reflective mirrors and partially reflective mirrors (called beam
splitters)—arranged as shown in the following schematic drawing, labeled figure 4—to
separate, direct, and ultimately recombine the three types of radiant energy (visible light,
near-infrared energy and far-infrared energy) into a final output image:

---

[7]The elements and claims of a patent are often numbered in bold.  See, e.g., Def.'s
Mot. Ex. B (Hansen patent) col.3 l.15–39.  The court omits such emphasis in this
Opinion.



*FIG. 4*

Id. fig. 4; see also id. col.3 l.10–13 (describing figure 4).

The following description accompanies figure 4:

> The multispectral radiant energy 6 . . . enters the sight through sighting
> window 15 . . . . A first partially reflective beam splitter 16A . . . passes the
> [far-infrared] wavelengths of radiant energy . . . along a far infrared
> spectrum channel 19A for processing. Beam splitter 16A reflects the
> shorter wavelength visible and near infrared spectrums to a second partially
> reflective beam splitter 16B[,] which passes the near infrared spectrum . . .
> radiant energy . . . [,] which is reflected off a first fully reflective mirror
> 16C along a near infrared spectrum channel 19C for processing. Beam
> splitter 16B reflects the visible spectrum of . . . radiant energy . . . along a
> visible spectrum channel 19B for processing. . . . All three channels have
> separate processing means and means for activating to process their
> respective radiant energy spectrums and whose processed signals exit
> therefrom . . . for an observer to view through eyepiece lens 12A.

Id. col.3 l.14–39.

Both of the imaging assemblies relevant to defendant's Motion are portrayed in
Figure 4. The Hansen device's thermal imager "is comprised of the readily available
U.S. Army forward looking infrared sight electro-optic elements"—including "an
uncooled focal plane array 18[,] controlled by focal plane array electronics 24[,] in which
the far infrared spectrum is converted to equivalent electrical signals[,] which are in turn
fed directly to a cathode ray tube display 26 for reconverting the electrical signals to the
visible spectrum." Id. col.3 l.43–53. The output of the cathode ray tube, which is red, "is

6

reflected off a fourth partially reflective beam splitter 56, which is red reflective, . . . to an observer." See id. col.3 l.53–57.  The image intensifier "is preferably a U.S. Army third generation image intensifier tube 28[,] which amplifies and magnifies the near infrared image."  Id. col.4 l.13–15.  The output of the image intensifier, which is green, is reflected "onto beam splitter 54, which is green reflective . . . for viewing by an observer."  See id. col.4 l.15–20.  "The visible spectrum channel 19B operates as a daytime sight" and directs visible light to an observer.  See id. col.3 l.62–65.

Of particular relevance to whether the Hansen device provides for independent brightness adjustment are the control knobs and switches on the device.  These control knobs and switches activate the near-infrared, far-infrared and visible light channels, and adjust the image viewed by the user.  The controls are visible in the following diagram:



Id. fig. 2A.

By turning rotary switch 30 on the Hansen device, the observer can activate the near-infrared channel, the far-infrared channel, the visible light channel or both the near-infrared and far-infrared channels.  See id. col.2 l.38–44.  When the visible light channel is not activated, visible light is blocked by light valve 50 (visible in figure 4).  See id. col.3 l.65–col.4 l.7.

The sight's output can be adjusted in several ways.  Directly relevant to the parties' arguments are the adjustment capabilities described in the Hansen patent: "Switches 34 and 36 control the power to [image intensifier tube] 28, [uncooled focal plane array] 18, [focal plane array electronics] 24, and [cathode ray tube] 26 to respectively control the scene contrast and brightness."  Id. col.4–l.26–28; see also id.

col.2 l.44–48 ("A plurality of thumb nail rotary switches 36, 34, and 32 . . . respectively adjust scene brightness, contrast, and the brightness of the reticle."[8]).

C.    Procedural History

Plaintiff filed this action on August 11, 2010, "seeking recovery of CANVS' reasonable and entire compensation, as well as all other appropriate remedies[] arising from Defendant's [alleged] infringement of [the '652 patent] and Defendant's [alleged] use and/or manufacture, without license or lawful right, of inventions described in and covered by CANVS' '652 patent." Compl. 1. Specifically, plaintiff alleged that the Enhanced Night Vision Goggle (device one) manufactured by ITT Industries infringed all seven claims of the '652 patent and "has been and is being used by and has been and is being manufactured for the United States without license." Id. ¶¶ 17–18. In subsequent briefing, plaintiff identified nine additional accused devices, produced by several manufacturers, including the Dual Band Universal Night Sight (device two). See CANVS Corp. v. United States, 110 Fed. Cl. 19, 25 n.3 (2013) (listing the ten accused devices). After a series of delays and subsequent failures to comply with the court's rules and orders, plaintiff's claims with respect to accused devices three through ten have been dismissed for failure to prosecute. See generally CANVS Corp. v. United States, 107 Fed. Cl. 100 (2012) (dismissing plaintiff's claims with respect to devices three through ten); CANVS Corp., 110 Fed. Cl. 19 (denying reconsideration). As a result, plaintiff is currently proceeding only with its claims respecting devices one and two. See CANVS Corp., 110 Fed. Cl. at 25.

On November 16, 2012, plaintiff filed a motion to amend its claim chart to add six additional devices. See Pl. CANVS Corp.'s 2d Mot. to Show Good Cause Supporting the Amendment of its Infringement Claim Charts, Dkt. No. 51, at 1. The court stayed this motion to amend pending the court's resolution of defendant's instant Motion. See Order of Mar. 26, 2013, Dkt. No. 63, at 2.

Defendant filed its Motion on March 12, 2013. See generally Def.'s Mot. Ordinarily, courts conduct claim construction proceedings before addressing whether the patent-in-suit is invalid. See, e.g., Akami Techs., Inc. v. Cable & Wireless Internet Servs., Inc., 344 F.3d 1186, 1192 (Fed. Cir. 2003) ("The first step in any invalidity analysis is claim construction . . . ."). In this case, however, the parties agree that claim construction is not required before the court decides defendant's Motion. See Def.'s Mot. 2 (adopting plaintiff's position on claim construction—that, with the exception of one claim term, no claim construction is necessary—for purposes of defendant's Motion).

II.    Legal Standards

---

[8]A reticle is "[a] grid or pattern placed in the eyepiece of an optical instrument, used to establish scale or position." The American Heritage Dictionary of the English Language 1488 (4th ed. 2006).

A.      Motions for Summary Judgment

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), a motion for summary judgment may be granted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a).[9]  A fact is material if it might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if, "view[ing] the record evidence through the prism of the evidentiary standard of proof that would pertain at a trial on the merits," Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001), "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248.

The moving party has the initial burden of establishing "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law."  Crater Corp. v. Lucent Techs., Inc., 255 F.3d 1361, 1366 (Fed. Cir. 2001).  Thereafter, "[t]he party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient."  SRI Int'l v. Matsushita Electric Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (en banc).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  Accordingly, the court may not weigh evidence or make credibility determinations when ruling on a motion for summary judgment.  Id.

B.      Anticipation

Patents are presumed to be valid, 35 U.S.C. § 282(a), a presumption that can be overcome only by clear and convincing evidence, Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1378 (Fed. Cir. 2005).  Pursuant to 35 U.S.C. § 102, a patent is invalid if it is anticipated by the prior art, that is, if "the invention was described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent."  35 U.S.C. § 102(e).  Specifically, "a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference."  Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1361 (Fed. Cir. 1998).  The anticipating reference must be enabling, meaning that it "must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation."  Minn. Mining & Mfg. Co v. Chemque, Inc., 303 F.3d 1294, 1306 (Fed. Cir. 2002).

---

[9]The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal Rules of Civil Procedure (FRCP).  See RCFC 56 rules committee note (2008 amendment) ("The language of RCFC 56 has been amended to conform to the general restyling of the FRCP."); C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC] generally follow the [FRCP].  [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c).").  Accordingly, the court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

"[A] prior art reference may anticipate when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it." Leggett & Platt, Inc. v. VUTEk, Inc., 537 F.3d 1349, 1354 (Fed. Cir. 2008) (internal quotation marks omitted). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." Atlas Powder Co. v. Ireco Inc., 190 F.3d 1342, 1347 (Fed. Cir. 1999). Courts properly may rely on extrinsic evidence[10] to determine whether a particular feature is inherently present in the prior art reference. Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1328 (Fed. Cir. 2001). "The evidence must make clear that the missing feature is necessarily present, and that it would be so recognized by persons of ordinary skill in the relevant art." Id. "While anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact." Leggett & Platt, Inc., 537 F.3d at 1352 (internal quotation marks omitted).

Because a patent must be proven invalid by clear and convincing evidence, Invitrogen Corp., 424 F.3d at 1378, "a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable [factfinder] could find otherwise," Eli Lilly & Co., 251 F.3d at 962.

III.   Discussion

   A.   Anticipation

Defendant contends that the '652 patent is invalid because each of its claims is anticipated by the Hansen device. Def.'s Mot. 1. Defendant provides a meticulously thorough analysis of where it believes each limitation of the claims enumerated in the '652 patent can be found in the Hansen patent. See generally id. Having reviewed defendant's analysis and the record evidence in detail, the court finds that defendant has satisfied its burden of initially establishing "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law." Cf. Crater Corp., 255 F.3d at 1366 (stating that a party moving for summary judgment must establish "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law").

To avoid summary judgment, plaintiff in turn "must point to an evidentiary conflict created on the record . . . ." Cf. SRI Int'l, 775 F.2d at 1116. Plaintiff has identified two potential evidentiary conflicts. Plaintiff contends that defendant has improperly grouped claims five, six and seven together with claim one for analysis. Pl.'s Resp. 28–29. And plaintiff argues that the Hansen device does not anticipate the '652

---

[10]In the context of patent law, "[e]xtrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

patent because it "does not teach the independent adjustment of the [thermal imager] and [the image intensifier]."  Id. at 9.

Plaintiff identifies no other potential evidentiary conflict and posits no other reason that defendant is not entitled to summary judgment of anticipation.  For this reason, the court finds, as an apparent concession by plaintiff, that any claims of the '652 patent that do not describe independent brightness adjustment and that have not been improperly grouped with other claims are anticipated by the Hansen patent.  The court therefore focuses the following discussion on the grouping of claims and independent brightness adjustment.

1.      Defendant's Grouping of Claims Is Appropriate

Plaintiff contends that defendant has improperly grouped claims five, six and seven together with claim one in its discussion of anticipation instead of addressing each claim with separate evidence and argument.  Id. at 28–29; cf., e.g., Def.'s Mot. 13 (stating that, "[d]ue to the similarity of the claim language, the same reasoning [that applies to the thermal imager in claim one] applies to the 'first imaging assembly' in part (b) of claim 5 and the 'thermal imaging assembly' in part (b) of claims 6 and 7").  Plaintiff contends that defendant has "a statutory obligation . . . to address the invalidity of each claim separately."  Pl.'s Resp. 29 (citation omitted).  Plaintiff cites to Dayco Products, Inc. v. Total Containment, Inc. (Dayco), 329 F.3d 1358, 1370 (Fed. Cir. 2003), for the proposition that defendant's failure to discuss the claims of the '652 patent individually "is contrary to law, which requires that '[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; [and] dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.'"  Id. at 1370 (alterations in original) (quoting 35 U.S.C. § 282 (2000)).

However, as defendant correctly notes, see Def.'s Reply 22, the Dayco decision upon which plaintiff relies states that "it is permissible to group claims together for disposition where resolution involves the same issues of validity; however, the justification for such grouping is possible only where those issues are substantially identical," Dayco, 329 F.3d at 1370.  In this case, defendant has explained why it believes that its anticipation analysis of claim one also applies to claims five, six and seven.  See, e.g., Def.'s Mot. 13 (stating that, "[d]ue to the similarity of the claim language, the same reasoning [that applies to the thermal imager in claim one] applies to the 'first imaging assembly' in part (b) of claim 5 and the 'thermal imaging assembly' in part (b) of claims 6 and 7").  And claim one does appear to be "substantially materially identical" to claims five, six and seven for purposes of invalidity analysis.  Cf. Dayco, 329 F.3d at 1370.  As one example out of many, claim one describes an "image intensification assembly structured to generate a real time enhanced photon based image."  Def.'s Mot. Ex. A ('652 patent) col.6 l.42–43.  Claims five, six and seven describe a nearly identical assembly.  See id. col.7 l.30–32 (claim five, describing an

"imaging assembly structured to generate an enhanced photon based image"); id. col.8 l.9–11 (claim six, describing "an image intensification assembly structured to generate an enhanced photon based image"); id. col.8 l.26–28 (claim seven, describing "an image intensification assembly structured to generate an enhanced photon based image").

Plaintiff fails to rebut this showing with its own explanation of why claims five, six and seven are materially different for purposes of anticipation. On the contrary, plaintiff concedes that, for purposes of defendant's Motion, claim one is representative of claims five, six and seven. See Pl.'s Resp. 6 n.2 (stating that the differences between the claims, "except for claim 4, are not material to the issues of validity raised by Defendant"). The court therefore concludes that defendant's discussion of claim one simultaneously with claims five, six and seven is appropriate. Cf. Dayco, 329 F.3d at 1370 (stating that grouping is permissible where the issues raised by each claim "are substantially materially identical").

> 2.    A Reasonable Factfinder Could Conclude that Independent Brightness Adjustment Is Not Found—Either Expressly or Inherently—in the Hansen Patent
>
> a.    A Reasonable Factfinder Could Conclude that Independent Brightness Adjustment Is Not Expressly Described in the Hansen Patent

Plaintiff contends that the Hansen patent does not anticipate the '652 patent because it "does not teach the independent adjustment of the [thermal imager] and [the image intensifier]." Pl.'s Resp. 9; see also Oral Argument of Mr. Zito at 10:05:45–06:03 (contending that whether the Hansen patent anticipates this feature of the '652 patent is "[t]he essence of what we're talking about today"). This independent brightness adjustment feature is described in claims four, five and seven of the '652 patent.[11] Def.'s

---

[11]Plaintiff maintains that this individual adjustment is described in parts (i) and (j) of claim one of the '652 patent. See Oral Argument of Mr. Zito at 10:17:10–24, 44–53; cf. Pl.'s Resp. 8–9 (asserting that parts (f) through (j) together make it possible "to independently adjust the intensity of both of the image sensors to deliver the proper mix of image intensity"). The court understands plaintiff to be referring specifically to part (i) of claim one, which describes the image intensifier and the thermal imager as "being structured to be operable independent from one another." Def.'s Mot. Ex. A ('652 patent) col.6 l.54-56. However, this is a description, not of independent adjustability, but of independent operability, a feature the Hansen patent plainly teaches. The Hansen patent states that rotary switch 30 may be turned to connect to one of four electrical contacts: "electrical contact 31A for activating the visible spectrum of the multispectral sight, contact 31B for activating the near infrared spectrum, contact 31C for activating the far infrared spectrum, or contact 31D for activating both the near infrared spectrum and the far infrared spectrum simultaneously." Def.'s Mot. Ex. B (Hansen patent) col.2 l.38–44.

Mot. Ex. A ('652 patent) col.7 l.19–23 (claim four), col.7 l.33–38 (claim five), col.8 l.29–33 (claim seven).

The court first considers whether the Hansen patent expressly teaches independent brightness adjustment. Both parties focus on the following sentence of the Hansen patent specification: "Switches 34 and 36 control the power to [image intensifier tube] 28, [uncooled focal plane array] 18, [focal plane array electronics] 24, and [cathode ray tube] 26 to respectively control the scene contrast and brightness." Def.'s Mot. Ex. B (Hansen patent) col.4 l.26–28; cf. Def.'s Mot. 15–16 (interpreting this sentence); Pl.'s Resp. 9–15 (same); Def.'s Reply 14–15 (same). No wiring diagram was included to show the connections described in this sentence.

Plaintiff contends that the "[p]lain reading of the sentence demonstrates that [switches 34 and 36 control] the brightness and contrast of the entire scene," but not of the thermal imager and image intensifier individually. Pl.'s Resp. 11 (emphasis omitted). Plaintiff contends that the sentence "could be re-written as: Switch 34 controls the power to 28, 18, 24, and 26 to control the scene contrast [and] switch 36 controls the power to 28, 18, 24, and 26 to control scene brightness." Id. (italicization omitted); see also id. at 10 ("[B]oth switches are connected to both sensors . . . ."); Oral Argument of Mr. Zito at 10:23:54–24:01 ("Switch 34 respectively controls contrast. Switch 36 respectively controls brightness.").

Defendant responds that "the most logical reading" of the sentence is that "rotary switch 34 controls power to the image intensifier 28, while rotary switch 36 controls power to the thermal imager, which comprises elements 18, 24, and 26." Def.'s Reply 14. Stressing the Hansen patent's use of the word "'respectively'" and the fact that the Hansen patent describes "'separate processing means'" for the image intensifier and the thermal imager, defendant contends that it would be logical to group element 28 (the image intensifier) apart from elements 18, 24 and 26 (the thermal imager) and to assign a separate power control to each. See id. (quoting id. Ex. B (Hansen patent) col.3 l.34–35); Oral Argument of Mr. Hudalla at 11:08:44–47 ("[O]f course, you would group the elements of the thermal imager together."). Therefore, defendant contends, "thumb nail rotary switches 34 and 36 in Hansen control the power to the image intensifier and the thermal imager, respectively." Def.'s Mot. 15.

It is the court's view, however, that the plain meaning of the contested sentence favors plaintiff's position. The word "respectively" means "[s]ingly in the order designated or mentioned." The American Heritage Dictionary of the English Language 1485 (4th ed. 2006). Therefore, if "[s]witches 34 and 36 . . . respectively control the scene contrast and brightness," Def.'s Mot. Ex. B (Hansen patent) col.4 l.26–28, it would follow that switch 34 controls scene contrast and switch 36 controls brightness.

Additional support for this interpretation of the patent language at issue is found in the following sentence that appears on the previous page of the Hansen patent: "A

plurality of thumb nail rotary switches 36, 34, and 32, . . . respectively adjust scene brightness, contrast, and the brightness of the reticle." Id. col.2 l.44–48. This earlier appearing sentence uses a construction similar to that in the later contested sentence, without mention of the two imaging assemblies to which—defendant asserts—the word "respectively" refers. The earlier appearing sentence with similar construction would seem to unambiguously state that switch 36 controls scene brightness, switch 34 controls scene contrast and switch 32 controls the brightness of the reticle. For this reason, the court is persuaded that a reasonable factfinder could conclude that defendant has failed to prove by clear and convincing evidence that the Hansen patent expressly discloses independent brightness adjustment. Cf. Eli Lilly & Co., 251 F.3d at 962 (stating that "a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable [factfinder] could find otherwise"). Having determined that a reasonable factfinder could conclude that independent brightness adjustment is not explicitly present in the Hansen patent, the court considers whether such adjustment feature could be found to be inherently present.

        b.      A Reasonable Factfinder Could Conclude that Independent Brightness Adjustment Is Not Inherently Present in the Hansen Patent

When extrinsic evidence has been presented to establish that a feature is inherently present, "[t]he evidence must make clear that the missing feature is necessarily present, and that it would be so recognized by persons of ordinary skill in the relevant art." Telemac Cellular Corp., 247 F.3d at 1328.

As the preceding discussion indicates, the Hansen patent states that switch 34 controls the power to the image intensifier and thermal imager to control scene contrast, and switch 36 controls the power to the image intensifier and thermal imager to control scene brightness. See Def.'s Mot. Ex. B (Hansen patent) col.2 l.44–48, col.4 l.26–28. Defendant contends that the term "scene contrast" would not be understood to refer, as plaintiff asserts, to "the relative difference between the lightest and darkest portions" of the images created by the image intensifier and the thermal imager, see Pl.'s Resp. 15 (citing id. Ex. C. (Gillespie Aff.) ¶ 50[12]), but rather to the color contrast between the green image created by the image intensifier and the red image created by the thermal imager, Def.'s Reply 17; see also Oral Argument of Mr. Hudalla at 11:12:07–10 ("The scene contrast here is color contrast."). The user would adjust this type of color contrast by adjusting the relative brightness of the red and green images to create more or less of the final image. See Oral Argument of Mr. Hudalla 11:13:32–38 ("The contrast comes from color contrast. You can turn the red up; you can turn the green up."). As defendant

---

[12]The affidavit of Mr. Gillespie, plaintiff's expert witness, is organized into numbered paragraphs but also contains section titles that are not numbered. See Pl.'s Resp. Ex. C (Gillespie Aff.) passim. The court provides paragraph numbers when citing the numbered paragraphs and page numbers when citing the section titles.

correctly notes, see Def.'s Reply 17, plaintiff agrees that "scene contrast" could refer to color contrast, see Pl.'s Resp. 16 (stating that "'scene contrast' could include 'color contrast' under certain circumstances"); cf. Pl.'s Resp. Ex. C (Gillespie Aff.) ¶ 52 (same).

Defendant insists that the term "scene contrast" would be understood to refer to this type of color contrast resulting from relative brightness because plaintiff's interpretation of the Hansen patent would require switch 34 "to do the impossible—namely, to control the contrast of an image intensifier." Def.'s Reply 15. Defendant accurately observes, and plaintiff's expert witness agrees, that the contrast of an image intensifier cannot be adjusted. Id. (citing, inter alia, id. Ex. J (Gillespie Dep.) 30:19–31:18 ("[Was there a way to] adjust the contrast of the output of an image intensifier . . . ? No, not that I know of.")). On the other hand, the record evidence establishes that a person of ordinary skill in the art would have known that it is possible to adjust the brightness of both an image intensifier and a thermal imager by controlling the power to them. See id. Ex. K (2d Waxman Aff.) ¶¶ 4–8 (presenting evidence that power control to adjust the brightness of image intensifiers and thermal imagers was known in the art); cf. Pl.'s Resp. 19 ("[C]ertain advanced [image intensification] tubes had and have the ability to manually adjust the gain or power delivered to the tube to vary the intensity of the image that is output to the user.")[13]; Pl.'s Resp. Ex. C (Gillespie Aff.) ¶ 57 (same). Defendant adds that plaintiff's view of the Hansen patent requires both switch 34 and switch 36 to control the power to both imaging assemblies, a redundancy that defendant argues "would be equivalent to having two volume controls on your radio in your car." Oral Argument of Mr. Hudalla at 11:17:35–54.

In response, plaintiff quotes testimony from its fact witness, Mr. Dumais—whom plaintiff describes as "the Navy WARCOM and SOCOM Joint Night Vision Working Group leader in charge of night vision at the critical time period"—stating that the Army did not "actually invent[] the subject matter" of the '652 patent. Pl.'s Resp. 4. Mr. Dumais further testified that the CANVS device "gave us capability to do things that I

---

[13]At oral argument and in its Sur-Reply, plaintiff contradicted its earlier expounded position by arguing that it is not possible to control the brightness of an image intensifier by controlling its power supply. See Oral Argument of Mr. Zito at 10:31:02–17 ("You cannot control the brightness of  . . . an image intensifier by controlling the external power to the image intensifier."); Pl.'s Sur-Reply, Dkt. No. 78, at 2–3 (disputing whether the references cited by defendant establish that it is possible to control brightness by controlling power); cf. Pl.'s Sur-Reply Ex. G (2d Gillespie Aff.) ¶¶ 17–19 (same). This argument is untimely—being raised for the first time in a sur-reply. It also contradicts the previous position advanced by both plaintiff and its expert witness. The court therefore deems it to be waived. Cf. Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 800 (Fed. Cir. 1990) (discussing "the sound practice that an issue not raised by an appellant in its opening brief . . . is waived" unless waiver "would result in basically unfair procedure").

knew we were not capable [of] before.'"  Id. at 1; id. Ex. D (Dumais Dep.) 140:9–11.
The implication of this testimony is that if the Hansen device—which was invented by an
Army employee, see Def.'s Mot. Ex. B (Hansen patent) [75] (stating that Mr. Hansen was
stationed at Fort Belvoir, Virginia)—had featured independent brightness adjustment, Mr.
Dumais would have been aware of it.  However, as defendant rightly points out, "Mr.
Dumais was on active duty with the Navy at the time of [the] Hansen [device's
patenting], so it is unsurprising that Mr. Dumais was not aware of all—or even any—of
the night vision development activities occurring within the Army."  Def.'s Reply 4
(citing Pl.'s Resp. Ex. D (Dumais Dep.) 21:22–22:2).

   Plaintiff then makes a number of arguments—based on the testimony of its expert
witness, Mr. Gillespie—about how the Hansen patent would be interpreted by a person of
ordinary skill in the art.  Certain of the arguments plaintiff puts forward are not supported
by the record evidence.  Others contradict plaintiff's prior positions—without
explanation—or focus on issues that are irrelevant to an anticipation analysis on summary
judgment.  The court has closely studied these arguments but concludes that they would
fail to persuade a reasonable factfinder that an independent adjustment feature is
inherently present in the Hansen patent.  The court sets forth a few illustrative examples
of plaintiff's arguments below.

   Plaintiff first contends that the Hansen patent could not have referred to red-green
color contrast because, "at the time the Hansen invention was made, night vision goggles
did not have color displays" and instead "provided a monochrome image to the user."
Pl.'s Resp. 16 (citing, inter alia, id. Ex. C (Gillespie Aff.) ¶ 52).  But, the court
understands this argument to reflect a misstatement by Mr. Gillespie in his affidavit,
which was subsequently addressed in his deposition.  See Def.'s Reply Ex. J (Gillespie
Dep.) 177:3–179:15 (acknowledging that he had "used the wrong terminology" in the
referenced paragraph of his affidavit, that night vision devices had "colored display but
not color display" and that the Hansen device would have combined a red and a green
image).

   Plaintiff also asserted in its briefing that defendant's expert witness, Dr. Waxman,
incorrectly interpreted the transmissive properties of the beam splitters described in the
Hansen patent.  Pl.'s Resp. 17–18; see also Pl.'s Sur-Reply 1–2, 4–7.  At oral argument,
plaintiff explained that it had offered this argument, "not because [it] somehow makes
[the Hansen patent] a nonanticipatory reference," but to rehabilitate the credibility of its
witnesses, Mr. Gillespie and Mr. Dumais.  See Oral Argument of Mr. Zito at 11:50:03–
51:39.  The court declines plaintiff's invitation to consider this argument because
credibility determinations cannot be made in the context of a summary judgment motion.
Anderson, 477 U.S. at 255.

   Plaintiff further argued in briefing that the Hansen patent did not anticipate the
'652 patent because "the Hansen patent [w]as just another example of overlay technology
or 'poor man's fusion.'"  Pl.'s Resp. 4 (quoting id. Ex. D (Dumais Dep.) 58:19); see also
id. at 5–6 (stating that "the CANVS device was the first time that true optical fusion had
been accomplished").  As clarified during oral argument, plaintiff's argument appears to

turn on its view of a qualitative distinction between the fusion achieved in the Hansen device and that accomplished by the '652 patent.  See, e.g., Oral Argument of Mr. Zito at 10:46:57–47:12 ("Overlay is fusion; fusion is overlay.  If you just do overlay, it's poor man's fusion.  If you improve the overlay . . . , then it becomes good fusion or true fusion . . . .").  However, plaintiff identifies no record evidence that described precisely what this distinction is or why it is significant in this anticipation analysis.

Although plaintiff agreed in its briefing that the terms "brightness," as used in the Hansen patent, and "intensity," as used in the '652 patent, are synonymous, see, e.g., Pl.'s Resp. 15 (stating that "a person of ordinary skill in the art would understand . . . [the term] 'light intensity'" used in the Hansen patent to mean "'scene brightness'"), plaintiff contradicted its earlier offered view at oral argument.  There, plaintiff appeared to contend that the Hansen patent's adjustment of brightness does not anticipate the '652 patent's adjustment of intensity.  Instead, plaintiff posited that "brightness . . . refers to one way of changing the intensity," whereas intensity refers to the "quant[um] of information" transmitted to the viewer.  Oral Argument of Mr. Zito at 10:43:10–29.  When asked whether supportive evidence for this proposition could be found in the record, plaintiff responded, "No, other than how the term is used in [the '652] patent."  Id. at 10:47:18–48:10.  In accordance with the Federal Circuit's guidance, however, the Hansen patent need not use precisely the same phrasing as the '652 patent to anticipate its claims.  Cf. In re Bond, 910 F.2d 831, 832 (Fed. Cir. 1990) (stating that anticipation "is not an 'ipsissimis verbis' test").

Among the many alternative arguments it put forward, plaintiff contends, "[T]here is no evidence of the Hansen invention.  No prototypes, no records, no proposals, nothing."  Pl.'s Resp. 4.  But as defendant correctly observes, "'[a]nticipation does not require the actual creation or reduction to practice of the prior art subject matter; anticipation requires only an enabling disclosure.'"  Def.'s Reply 21 (alteration in original) (quoting Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373, 1380 (Fed. Cir. 2003)).

Plaintiff suggests that the Hansen patent was insufficiently detailed to be such an enabling disclosure, see Pl.'s Resp. 14 (stating that the Hansen patent provides "no idea, explanation or suggestion to how to achieve" adjustment of scene brightness or scene contrast), but the Hansen patent is no less detailed than the '652 patent.  Missing from the '652 patent is a description of how image brightness is to be adjusted, and as defendant accurately states in its briefing, the same presumption of enablement that applies to the '652 patent applies to prior art references.  Def.'s Reply 21 (citing Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1315 (Fed. Cir. 2009)).

A feature asserted to be inherent in a prior art reference must be shown to be "necessarily present, not merely probably or possibly present."  Trintec Indus., Inc. v. Top-U.S.A. Corp., 295 F.3d 1292, 1295 (Fed. Cir. 2002) (internal quotation marks omitted).  Here, defendant's burden is to demonstrate that independent brightness adjustment is necessarily present in Hansen with "such clear and convincing evidence of

invalidity . . . that no reasonable [factfinder] could find otherwise." Cf. Eli Lilly & Co., 251 F.3d at 962.  The court is not persuaded on this record that defendant has met this burden.

Defendant effectively alleges that a person of ordinary skill in the art would know that this control configuration does not operate as described because controlling contrast through an image intensifier is not possible and because using two switches to control the power for both imaging devices is unnecessarily redundant.  Defendant posits that one switch should be understood to control the brightness of each imaging assembly, which allows the color contrast of the scene to be adjusted.  But the record evidence before the court does not compel a reasonable factfinder to reach this conclusion.  In addition, although defendant's interpretation of the language of the Hansen patent might offer a more functional device, it does not comport with the patent's seemingly plain language that one switch controls contrast and the other controls brightness.  Accordingly, a reasonable factfinder could conclude that defendant has failed to prove by clear and convincing evidence that independent brightness adjustment is necessarily present in the Hansen patent.[14]  Cf. Eli Lilly & Co., 251 F.3d at 962.

Absent such clear and convincing proof from defendant, a genuine issue of material fact remains regarding whether the claims that describe independent brightness adjustment (these are, claims four, five and seven) are anticipated by the Hansen patent. Cf. id.  Defendant, however, has succeeded in showing—and plaintiff has failed to create a genuine issue of material fact rebutting such showing—that the other claims (specifically, claims one through three and claim six) are anticipated by the Hansen patent.  Plaintiff's arguments with respect to grouping and independent brightness adjustment do not persuade, see supra Part III.A.1 (discussing grouping), III.A.2 (discussing independent brightness adjustment), and plaintiff provides no basis upon which a reasonable factfinder could conclude differently, cf. Eli Lilly & Co., 251 F.3d at 962.

---

[14]Additionally, it is not clear to the court that it properly could find that independent brightness adjustment is inherently present in the Hansen device on the basis of extrinsic evidence that contradicts the express language of the Hansen patent.  Cf. Markman, 52 F.3d at 980 (stating, in the context of claim construction, that "[e]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims"); Rhine v. Casio, Inc., 183 F.3d 1342, 1345 (Fed. Cir. 1999) (stating, in the context of claim construction, that "the familiar axiom that [c]laims should be so construed, if possible, as to sustain their validity" has no application "if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid" (alteration in original) (internal quotation marks omitted)).

Accordingly, defendant is entitled to summary judgment on the issue of anticipation with respect to claims one through three and claim six, but not with respect to claims four, five and seven.

### B.     Obviousness

Defendant argues in the alternative that claims two and three of the '652 patent are rendered obvious by the combination of the Hansen patent and a second prior art reference. Def.'s Mot. 23–24. However, because the court has determined that claims two and three are invalid due to anticipation by the Hansen patent, the court does not— and need not—reach defendant's obviousness argument. Cf. 3 Moy's Walker on Patents § 9:49 (4th ed. 2013) (stating that, where claims are found to be anticipated, "the issue of obviousness need not be reached").

### C.     The Offered Expert Testimony

Defendant's final argument is that the testimony of plaintiff's expert, Mr. Gillespie, "is so defective as to call into question his qualification as an expert witness in this case." Def.'s Reply 23. Defendant argues that "the Court should exercise its gatekeeping role and cast aside Mr. Gillespie's opinions" pursuant to the Supreme Court's guidance in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Id.

Among the challenges defendant directs toward Mr. Gillespie's testimony are:  (1) his erroneous assertion that it is not possible to adjust the brightness of an image intensifier; and (2) "Mr. Gillespie's faulty analysis of rotary power control switches 34 and 36 in [the] Hansen [device, which] not only ignore[d] the interaction of these switches with selector switch 30, but . . . also [was] premised on the implementation of a contrast control for an image intensifier that he admitted was impracticable." Id. In addition, defendant points to Mr. Gillespie's concession in his deposition that he is "'not a beam splitter expert.'" Id. (quoting id. Ex. J (Gillespie Dep.) 169:4). Defendant argues that "because Mr. Gillespie's faulty opinions undergird all of plaintiff's arguments, the Court should find that plaintiff has failed to raise a genuine issue of material fact."[15] Id. at 23–24.

---

[15]Plaintiff contends that "[a] 'suggestion . . . that the Court should exercise its gatekeeping role' is not a proper Daubert motion and . . . objects to the inference that Mr. Gillespie's opinions could be 'cast aside' based upon a suggestion." Pl.'s Sur-Reply 1 n.1 (emphasis added).  Notwithstanding plaintiff's assertion, it is not clear to the court that defendant's effort to exclude Mr. Gillespie's testimony "is not a proper Daubert motion." Cf. id. (emphasis added).  Although adduced in a reply brief, defendant's request is timely because it responds and objects to the positions taken by Mr. Gillespie in an affidavit submitted with plaintiff's Response. See Def.'s Reply in Supp. of its Mot. for Summ. J. of Invalidity of all Claims of the Patent-in-Suit, Dkt. No. 69, at 23–24. Plaintiff asked for—and was granted—oral argument and leave to file a sur-reply on the

Pursuant to the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589.  After reviewing carefully the asserted flaws in Mr. Gillespie's offered expert testimony, the court declines to grant defendant's request to exclude Mr. Gillespie's testimony.  Mr. Gillespie did title a section of his affidavit "No gain or intensity control of an [image intensifier] tube in 1990," and he made averments consistent with that proposition.  Pl.'s Resp. Ex. C (Gillespie Aff.) 19 (emphasis and some capitalization omitted).  Moreover, when Mr. Gillespie was asked in his deposition to confirm that, "there is no way to change the brightness of the green screen that a user sees on an [image intensifier] tube," he responded, "Correct."  Def.'s Reply Ex. J (Gillespie Dep. 64:18-21).  But Mr. Gillespie did also acknowledge in his affidavit that "certain advanced [image intensifier] tubes had and have the ability to manually adjust the gain or power delivered to the tube to vary the intensity of the image that is output to the user," Pl.'s Resp. Ex. C (Gillespie Aff.) ¶ 57.  The court is persuaded that a reasonable factfinder could agree with Mr. Gillespie's proposed interpretation of switches 34 and 36, see supra Part III.A.2, and to the extent defendant is convinced that Mr. Gillespie's testimony is erroneous on the subject of independent brightness adjustment capacity, the court urges defendant to address such concerns by further motion or at trial.

Contrary to defendant's urging, the court does not exclude Mr. Gillespie's testimony on the topic of beam splitters based on his concession that he is "not a beam splitter expert."  Cf. Def.'s Reply Ex. J (Gillespie Dep.) 169:4.  Mr. Gillespie admitted that he "relied on . . . the optics guys to do that when we did it at the lab" and forthrightly stated that he was "surmising" about the operation of the beam splitters.  Id. at 169:4–8.  Expertise in beam splitting appears to be a subspecialty of the optics specialists working with night vision technology.  Having reviewed Mr. Gillespie's testimony with respect to beam splitters, the court does not find Mr. Gillespie's testimony on beam splitters to be so uninformed or otherwise unreliable that it must be excluded.  Moreover, because the court is mindful of the cost to the parties associated with the hiring of multiple specialists in the various fields associated with night vision, see RCFC 1 (directing the court to pursue the "just, speedy, and inexpensive determination of every action and proceeding"), and because both parties appear to consider the beam splitter discussion irrelevant to whether the Hansen patent is an anticipatory reference, see Oral Argument of Mr. Zito at 11:50:03–51:39 (stating that plaintiff presented evidence with respect to beam splitters, "not because that somehow makes [the Hansen patent] a nonanticipatory reference," but to rehabilitate the credibility of plaintiff's witnesses Mr. Gillespie and Mr. Dumais); Oral Argument of Mr. Hudalla at 11:28:09–29:43 (stating that plaintiff's arguments about beam splitters are irrelevant to an anticipation analysis), the court denies defendant's

---

issue of expert qualification.  See Order of Aug. 27, 2013, Dkt. No. 75, at 2–3.  As a procedural matter, plaintiff therefore was afforded ample opportunity to respond to defendant's challenge.

request.  Should the functioning of beam splitters emerge, however, as an important issue in this case, defendant may renew its motion.

Plaintiff also asserted a challenge to the admission of defendant's expert's testimony.  Plaintiff argued that "if any testimony should be 'cast aside' based upon a suggestion, it should be the testimony of Dr. Waxman," who "blatantly misquoted the Hansen reference."  Pl.'s Sur-Reply 1 n.1 (citing Pl.'s Resp. 12–13).  It is plaintiff's view that Dr. Waxman engaged in an exercise of "intentional misleading" by "refer[ing] to sentences he . . . made up as direct quotes . . . from [the] Hansen [patent]."  Pl.'s Resp. 12–13.  Plaintiff contends that Dr. Waxman "selectively removed words" to alter the sentence describing switches 34 and 36 of the Hansen patent so it would appear to teach independent brightness adjustment of the image intensifier and the thermal imager.  Id. at 12; see also supra Part III.A.2.a (discussing the parties' arguments with respect to this sentence).  But, it is apparent to the court from Dr. Waxman's affidavit that he rephrased the sentence of interest—as did plaintiff's expert[16]—merely to clarify what he believed it to mean, not to mislead the court.  See Def.'s Mot. Ex. E (Waxman Aff.) ¶ 9 (explaining the referenced sentence).  Thus, plaintiff's argument does not persuade.  The court denies plaintiff's request to strike Dr. Waxman's testimony.

IV.   Conclusion

As explained in much greater detail in this Opinion, defendant's Motion is GRANTED with respect to the anticipation of claims one through three and claim six of the '652 patent.  The court finds that each limitation of these claims is found in the Hansen patent.  Defendant's Motion is DENIED, however, with respect to the anticipation of the claims of the '652 patent that describe independent adjustment of the brightness of the image intensifier and thermal imager—that is, claims four, five and seven—because a reasonable factfinder could conclude that the Hansen patent does not teach this feature.  Because it is unnecessary to reach the issue of obviousness, defendant's Motion is DENIED with respect to the obviousness of claims two and three as MOOT.  Defendant's motion is also DENIED insofar as defendant requests the striking of Mr. Gillespie's testimony because the court does not find Mr. Gillespie's testimony so unreliable as to compel such action.  In addition, the court finds unpersuasive plaintiff's request to strike the testimony of Dr. Waxman as misleading and DENIES same.

A separate order will issue shortly, after the issuance of this Opinion, to address plaintiff's stayed motion to amend its claim chart to include additional devices.

---

[16]Plaintiff similarly proposed that the same sentence could be rephrased to clarify its meaning.  See Pl.'s Resp. 11 (suggesting that the sentence "could be re-written as: Switch 34 controls the power to 28, 18, 24, and 26 to control the scene contrast [and] switch 36 controls the power to 28, 18, 24, and 26 to control scene brightness" (italicization omitted)).

IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge